**COMMONWEALTH of Kentucky, Appellant,**

v.

**David BUCHANON, Appellee.**

No. 2001–SC–1056–DG.

Supreme Court of Kentucky.

Dec. 18, 2003.

As Modified Jan. 12, 2004.

A.B. Chandler, III, Attorney General, George G. Seelig, Assistant Attorney General, Criminal Appellate Division, Office of the Attorney General, Frankfort, Counsel for Appellant.

Joseph Kirwan, Coffman & Kirwan, Bowling Green, Counsel for Appellee.

STUMBO, Justice.

David Buchanon was arrested and entered a conditional plea of guilty to first-degree possession of a controlled substance, driving under the influence, possession of marijuana, and possession of drug paraphernalia after being stopped at a roadblock operated by the Butler County Sheriff's Department at the intersection of Kentucky Highways 70 and 1117/369. Buchanon moved to suppress the evidence seized from his vehicle based on his claim

that the police roadblock was in violation of the Fourth Amendment. The trial court subsequently denied Buchanon's motion to suppress; however, the Court of Appeals vacated the trial court's judgment and remanded the case in order to allow Buchanon to withdraw his guilty plea. The Court of Appeals found that the roadblock was constitutionally impermissible under *City of Indianapolis v. Edmond,* 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), and *United States v. Huguenin,* 154 F.3d 547 (1998). We accepted discretionary review and hereby affirm the opinion of the Court of Appeals.

On September 5, 1999, the Butler County Sheriff's Department set up and maintained a roadblock that stopped every car in both directions of Highway 70 west in Butler County. David Buchanon was driving to work in Muhlenburg County at approximately 6:30 p.m. when he approached the roadblock. The sheriff's department had placed a "spotter" several hundred yards before the roadblock who radioed ahead if a vehicle looked suspicious. As Buchanon's vehicle approached, the spotter alerted deputies at the roadblock that there was a lot of abnormal movement coming from inside the vehicle. When Buchanon reached the roadblock Deputy Steve Morris approached the vehicle and asked to see Buchanon's license and registration. Deputy Morris testified that there was a strong odor of cologne emanating from the vehicle, that Buchanon seemed "real nervous," and that his face was red and his eyes were bloodshot. Deputy Morris testified that he believed Buchanon to be under the influence of drugs. Buchanon was asked to exit the vehicle and was given two field sobriety tests, which although appearing unstable, he ultimately passed. Deputy Morris then asked Buchanon for permission to search his vehicle but was refused. At this time, Deputy Morris summoned the dog trained

to detect narcotics to the vehicle to conduct an exterior "sniff." The dog subsequently alerted to the presence of narcotics inside Buchanon's vehicle. The vehicle was then searched and the evidence that resulted in the above charges recovered.

The Commonwealth appeals the Court of Appeals' ruling that the roadblock operated by the Butler County Sheriff's Department was in violation of the Fourth Amendment pursuant to *Edmond* and *Huguenin, supra. Edmond* is the United States Supreme Court's most recent pronouncement on the constitutionality of suspicionless seizures occurring at highway checkpoints. In *Edmond,* the Supreme Court held an Indianapolis narcotics checkpoint program to be in contravention of the Fourth Amendment because its primary purpose was "to uncover evidence of ordinary criminal wrongdoing ...." 531 U.S. at 42, 121 S.Ct. 447. To allow checkpoint programs that target such a general interest in crime control would leave law enforcement authorities with the ability to construct roadblocks for nearly any conceivable purpose, thus rendering the Fourth Amendment's protections virtually nonexistent in this arena. *Id.* In *Edmond,* the parties conceded that the primary purpose of the Indianapolis checkpoints was the interdiction of illegal narcotics; however, the government asserted that the program was justified by its secondary purposes of detecting drunken drivers and verifying licenses and registrations. *Id.* at 46, 121 S.Ct. 447. The Court responded that "[i]f this were the case, however, law enforcement authorities would be able to establish checkpoints for virtually any purpose so long as they also included a license or sobriety check." *Id.* The Court indicated that it would now be necessary for courts to examine the evidence to determine

whether the actual primary purpose of the checkpoint is lawful, regardless of the government's ostensible or secondary purposes. *Id.* The Court, in a footnote, specifically reserved the question of whether a checkpoint with the primary purpose of checking licenses and registrations or driver sobriety and a secondary purpose of interdicting illegal narcotics would pass constitutional muster[1]. *Id.* at 47 n. 2, 121 S.Ct. 447.

It is well established that a highway stop of motorists at a government-operated checkpoint effectuates a seizure for Fourth Amendment purposes. *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 450, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412, 420 (1990); *United States v. Martinez–Fuerte,* 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116, 1128 (1976). In order to pass constitutional muster, the seizure must be deemed reasonable, which requires "a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown v. Texas,* 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357, 362 (1979). The Fourth Amendment requires that generally, in order to be reasonable, all searches and seizures must be accompanied by an individualized suspicion of wrongdoing. *Chandler v. Miller,* 520 U.S. 305, 308, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997). The United States Supreme Court has recognized certain situations, however, where individualized suspicion is not required in order for the brief seizure of motorists to be reasonable.

In *Martinez–Fuerte, supra,* the Supreme Court upheld the constitutionality of a fixed Border Patrol checkpoint with the primary purpose of intercepting illegal aliens. The Court focused on the significant government interest in patrolling the U.S. border and determined that it outweighed the minimal intrusion upon motorists briefly detained at the checkpoints. *Id.* at 561, 96 S.Ct. 3074.

In *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the Supreme Court held that random spot checks of motorists to determine if they held valid driver's licenses and registrations were invalid under the Fourth Amendment without some individualized suspicion of wrongdoing. *Id.* at 663, 99 S.Ct. 1391. The Court found that the intrusion upon lawful motorists was too great to justify a policy of randomly stopping vehicles to check compliance with licensure and registration laws. The stops were likened to the roving-patrol stops by Border Patrol agents held to be unconstitutional in *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). The Court warned against the "grave danger" inherent in this type of "standardless" and "unconstrained" discretion of law enforcement officers. *Prouse, supra,* at 662–663, 99 S.Ct. 1391. However, the Court intimated that a roadblock-type stop that checks all oncoming traffic for licenses and registrations would be a sufficient constraint on the discretion of police officials, thereby suggesting that this type of procedure would survive Fourth Amendment scrutiny. *Id.* at 663, 99 S.Ct. 1391.

In *Sitz, supra,* the Supreme Court held that the Michigan State Police's checkpoint program, designed to remove drunken drivers from the roadways, was consistent with the Fourth Amendment. 496

---

**1.** Although, the very presence of footnote two seems "divorced from the rest of the opinion," in that the language of the opinion itself seems to indicate that if the primary purpose is lawful, the checkpoint is constitutional. *See United States v. Moreno–Vargas,* 315 F.3d 489, 490 (5th Cir.2002); *United States v. Davis,* 270 F.3d 977, 979 (D.C.Cir.2001).

U.S. at 455, 110 S.Ct. 2481. The Court in *Sitz* stated that in order to determine the reasonableness of a highway checkpoint stop, courts must perform the balancing test enunciated in *Brown, supra. Id.* at 450, 110 S.Ct. 2481. The Court ultimately determined that the state's interest in eradicating drunk driving was sufficiently advanced by the sobriety checkpoint program, and that this interest far outweighed the intrusion upon motorists who were only briefly stopped at the checkpoints. *Id.* at 455, 110 S.Ct. 2481.

The Supreme Court's decision in *Edmond, supra*, reiterated that the constitutionality of such checkpoint programs of the type approved in *Sitz* and *Martinez–Fuerte*, "still depends on a balancing of the competing interests at stake and the effectiveness of the program." 531 U.S. at 47, 121 S.Ct. 447. However, the Court added that it would now be necessary for courts to conduct a purpose inquiry at the programmatic level in order to determine if the program is justified by a lawful primary purpose. *Id.* at 46–48, 121 S.Ct. 447. The *Edmond* Court determined that a primary purpose of general crime control, *i.e.* "interdicting illegal narcotics," did not justify a checkpoint program that stopped motorists without some indicia of individualized suspicion. *Id.* at 47, 121 S.Ct. 447.

Kentucky case law on the issue is sparse. Our Court of Appeals has adopted the reasoning of *Prouse* and *Sitz* and held that inherent in all constitutional checkpoints is constrained discretion of officers at the scene, and that the checkpoint be established pursuant to some sort of systematic plan. *See Commonwealth v. Bothman*, Ky.App., 941 S.W.2d 479 (1996); *Steinbeck v. Commonwealth*, Ky.App., 862

S.W.2d 912 (1993); *Kinslow v. Commonwealth*, Ky.App., 660 S.W.2d 677 (1983).

■ In the case at bar, the record reveals that signs posted as vehicles from one direction [2] neared the roadblock read, "DUI–DRUG CHECK AHEAD," "K–9 AT WORK," and "PREPARE TO STOP," although Buchanon himself would not have seen the signs prior to being stopped. Deputy Morris, the supervising officer at the scene, testified that the purpose of the roadblock was to "detect any violation of the law," including driving under the influence and possession of narcotics. Deputy Scott McIntosh testified that the purpose of the roadblock was "to make sure everyone was safe and sober." However, the record reveals that only Deputy Morris was trained in DUI detection in Kentucky (Deputy McIntosh was certified only in Tennessee), while the other officers at the scene did not have any DUI training. Deputy Morris testified that although he had a portable breathalyzer test (PBT) device at the roadblock, he did not administer the breath test to Buchanon because he did not smell any alcohol. There was also testimony presented at trial that the Butler County Sheriff's Department usually conducted such roadblocks in the afternoon and with a dog trained to detect narcotics present.

There was no written plan detailing the Butler County Sheriff's Department's policies and procedures to be followed when conducting vehicle checkpoints. Deputies Morris and McIntosh stated that the sheriff's department did follow certain procedures in the administration of all of its roadblocks, such as stopping every vehicle in both directions—first asking for the driver's license and registration, and then proceeding with more intrusive questions

**2.** Deputy Scott McIntosh testified that the sheriff's department only had enough signs to

place on one side of the road.

only if the officer smells alcohol or marijuana. Deputy McIntosh testified that the sheriff's department's training taught deputies to let motorists proceed if they produce a valid license and registration and if everything otherwise "checks out."

The Court of Appeals relied in part on the Sixth Circuit case of *Huguenin, supra,* which dealt with a "ruse" roadblock that was established at the end of an exit ramp and was designed to catch those drivers who exited the highway after having seen signs posted that there was a "Drug—DUI Enforcement" checkpoint further on down the highway. When motorists took the exit, which was not frequently used because no services were offered there, they were stopped by police and asked why they had exited the highway. There was a drug dog present at the checkpoint, but no breathalyzer device. Also, there was no checkpoint on the highway, as the signs had indicated. The Sixth Circuit found that the checkpoint's primary purpose was to detect narcotics and was therefore in violation of the Fourth Amendment. The court went on to hold that even if its primary purpose had been to detect drunk drivers, under the *Brown* balancing test, the severe degree of subjective and objective intrusion upon motorists far outweighed the government's interest in removing intoxicated drivers from the road. *Id.* at 563, 99 S.Ct. 2637.

We do not find the facts in *Huguenin* to be as strikingly similar to the present case as did the Court of Appeals; however, its analysis is proper. As later stated in *Edmond,* courts are required to determine the primary purpose of the vehicle checkpoint. If, in fact, the court finds that the purpose is one that has previously been held by the Supreme Court to be in violation of the Constitution, then there is no need to perform the balancing test enumerated in *Brown.* If, however, the primary purpose of the checkpoint were determined by the court to be valid, then it would be necessary to apply the balancing test to the facts of each case.

We conclude that the primary purpose of the roadblock in the case *sub judice* was to detect narcotics or "any violation of the law." Though admittedly, the circumstances here present a much more difficult case than as in *Huguenin,* where motorists were tricked and police had unfettered discretion, or as in *Edmond,* where the admitted primary purpose of the checkpoint was interdicting illegal narcotics. The *Edmond* Court noted the difficulty inherent in determining the primary purpose of a particular roadblock. 531 U.S. at 46–47, 121 S.Ct. 447. Indeed, we find this case to be particularly difficult. Ultimately, however, we must err on the side of caution when dealing with the most fundamental of those rights granted to our citizens to be free from unreasonable searches and seizures.

The presence of the drug dog at a roadblock held in the mid-afternoon operated by only one officer trained to detect drunk drivers, coupled with the testimony of Deputy Morris that the purpose of the roadblock was "to detect any violation of the law," indicates that the primary purpose of the roadblock was general crime control, or more specifically, the interdiction of illegal narcotics. The United States Supreme Court has proscribed this purpose in *Edmond* and we are bound by that decision.

■ We note that most law enforcement officials have not established official guidelines governing vehicle checkpoints. Although we are reluctant to mandate a set list of criteria for officials to follow, we can take this opportunity to suggest several non-exclusive factors courts may consider in determining the reasonableness of a particular roadblock. *Cf. Las Cruces v.*

*Betancourt,* 105 N.M. 655, 735 P.2d 1161 (1987).

First, it is important that decisions regarding the location, time, and procedures governing a particular roadblock should be determined by those law enforcement officials in a supervisory position, rather than by the officers who are out in the field. Any lower ranking officer who wishes to establish a roadblock should seek permission from supervisory officials. Locations should be chosen so as not to affect the public's safety and should bear some reasonable relation to the conduct law enforcement is trying to curtail.

Second, the law enforcement officials who work the roadblock should comply with the procedures established by their superior officers so that each motorist is dealt with in exactly the same manner. Officers in the field should not have unfettered discretion in deciding which vehicles to stop or how each stop is handled.

Third, the nature of the roadblock should be readily apparent to approaching motorists. At least some of the law enforcement officers present at the scene should be in uniform and patrol cars should be marked in some manner. Signs warning of a checkpoint ahead are also advisable.

Fourth, the length of a stop is an important factor in determining the intrusiveness of the roadblock. Motorists should not be detained any longer than necessary in order to perform a cursory examination of the vehicle to look for signs of intoxication or check for license and registration. If during the initial stop, an officer has a reasonable suspicion that the motorist has violated the law, the motorist should be asked to pull to the side so that other motorists can proceed.

We reiterate that the above list of factors is not exhaustive. Also, a mere violation of one factor does not automatically result in a violation of constitutional proportions. The guidelines are to be applied on a case-by-case basis in order to determine the reasonableness of each roadblock.

For the foregoing reasons, we hold that the roadblock set up by the Butler County Sheriff's Department was unconstitutional under *Edmond, supra,* and therefore any evidence seized pursuant to the search of Buchanon's vehicle should be suppressed. We affirm the Court of Appeals' opinion that remanded this case back to the Butler Circuit Court in order to allow Buchanon to withdraw his guilty plea.

LAMBERT, C.J.; COOPER and JOHNSTONE, JJ., concur.

GRAVES, J., dissents by separate opinion, with KELLER and WINTERSHEIMER, JJ., joining that dissent.

GRAVES, Justice Dissenting.

Respectfully, I dissent because this was a reasonable roadblock for a legitimate public interest, highway safety.

The Court of Appeals panel erred by impermissibly invading the fact-finding province of the circuit court and by construing too narrowly *City of Indianapolis v. Edmond,* 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), wherein the United States Supreme Court held that the Fourth Amendment had been violated because the city therein had conceded the primary purpose of the indianapolis checkpoints was narcotics detection. However, the Court expressly declined to address the constitutionality of multi-purpose roadblocks in the 6–3 decision. "[W]e need not decide whether the State may establish a checkpoint program with the primary purpose of checking licenses or driver sobriety and a secondary purpose of interdicting narcotics." *Id.* at 47, 121 S.Ct. at 457, n. 2.

By comparison to the narcotics checkpoints considered in *Edmond, supra,* this case concerns a "routine roadblock ... safety check" established by the Butler County Sheriff's office at the intersection of KY 70 and KY 1117/369. As was the custom of that office, the "roadblock/safety check" was operated so as to stop all traffic traveling in both directions beginning at mid-afternoon on September 5, 1999, for the purpose of "checking for proper vehicle registration, DUI, drugs, and other violations." Officers on the scene were accompanied by a "K–9" unit for the stated purposes of providing protection, drug detection, as needed, as well as any necessary tracking of persons attempting flight on foot. Signage warned approaching drivers of a "DUI–DRUG CHECK AHEAD."

The Court of Appeals panel further erred in embracing the logic enunciated by the 2–1 majority in *United States v. Huguenin,* 154 F.3d 547 (6th Cir.1998), disparaging "mixed-motive checkpoints." Although Buchanon points out that this Court is bound by the Sixth Circuit, this case presents different circumstances from the roadblock ruse repeatedly referred to by the Sixth Circuit majority as a "trap" engendering "fear and surprise." *Id.* at 561.

Because it is permissible to establish a valid sobriety check point that has a secondary or collateral purpose of drug interdiction, I would reverse the Court of Appeals and reinstate the judgment of the Butler Circuit Court.

KELLER, and WINTERSHEIMER, JJ., join this dissenting opinion.